REVISED APRIL 29, 2002
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-50360

_____


RICHARD M. KEENAN and RAY PRZYBYLSKI,

Plaintiffs-Appellants,

versus

RUBEN TEJEDA, Bexar County Constable, Precinct Five,
Individually and in his Official Capacity,
JOSEPH MARTINEZ, Bexar County Constable, Precinct Five,
Individually and in his Official Capacity, and
BEXAR COUNTY, TEXAS, a political subdivision of the
State of Texas,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

_____

April 23, 2002

Before JONES and DeMOSS, Circuit Judges, and LIMBAUGH, District
Judge.[*]

EDITH H. JONES, Circuit Judge:

Richard Keenan and Ray Przybylski alerted the Bexar

County district attorney and a San Antonio television station to

possible wrongdoing by a Bexar County constable, Ruben Tejeda.

_____

[*]      District Judge of the Eastern District of Missouri, sitting by
designation.

After the television station aired a critical report on the constable, Keenan and Przybylski were subjected to a "felony" traffic stop by numerous officers with guns drawn, and Keenan was prosecuted unsuccessfully for "deadly conduct" for allegedly pointing a gun at the constable. Keenan and Przybylski then filed this § 1983 action against Constable Tejeda, Deputy Constable Joseph Martinez, and Bexar County. The district court granted summary judgment for the defendants. We hold that (1) the defendants were not entitled to summary judgment on the plaintiffs' First Amendment retaliation claim, (2) fact questions exist as to whether Constable Tejeda and Deputy Constable Martinez are entitled to qualified immunity from suit, (3) the plaintiffs waived their Equal Protection and Due Process claims by not properly presenting them to the district court, and (4) Bexar County is not subject to liability under § 1983.

## I. FACTS AND PROCEDURAL HISTORY

Keenan and Przybylski worked for several months in 1995 as reserve deputy constables for Precinct Five of Bexar County. During this time, Keenan and Przybylski observed on-duty deputy constables serving notices to vacate premises and providing private security services. In return for his deputies' services, Constable Ruben Tejeda would collect a small fee. Keenan and Przybylski

2

believed these practices were unlawful, a view confirmed by two Texas Attorney General Letter Opinions.[1]

After resigning their positions, Keenan and Przybylski reported these activities to the Bexar County district attorney and a San Antonio television station, KENS-TV, which aired a highly critical, six-part investigative report entitled "Constable Cash" in November 1996. Richard Keenan appeared in the "Constable Cash" series as a disguised informant. Despite the attempt to conceal Keenan's identity, Constable Tejeda and Deputy Constable Joseph Martinez apparently believed (according to the chief deputy constable) that Keenan and Przybylski were responsible for exposing the improper practices in the constable's office. Keenan and Przybylski allege that Constable Tejeda and his deputies began harassing them in retaliation for exercising their First Amendment rights. The plaintiffs focus on two incidents.

First, in June 1997, Deputy Constable Martinez stopped Przybylski's car as Przybylski and Keenan were driving down a heavily-traveled street in San Antonio at 11:45 p.m. on a Sunday night. Chief Deputy Constable Michael Lacey stated in his affidavit that he drove to the scene because he had heard a deputy say over the precinct's radio that he had "spotted Keenan and

---

[1] Op. Tex. Att'y Gen. No. 97-026 (1997); Op. Tex. Att'y Gen. No. 97-069 (1997). Both opinions were issued in response to queries from the Bexar County Criminal District Attorney.

Przybylski," and Deputy Martinez had said, "Let's get them." When Lacey arrived, Martinez and three other deputies were holding Keenan and Przybylski at gunpoint.[2] Constable Tejeda arrived shortly thereafter with several other deputy constables and four officers from the San Antonio Police Department. The constables detained Keenan and Przybylski for approximately 30 minutes to an hour and cited Przybylski for driving without a rear license-plate light. The police report suggests that Przybylski showed the officers that the light was working, but Deputy Martinez wrote in his report that the "light was inoperable at the time of the offense." The traffic ticket was later dismissed.

Second, in December 1997, Keenan attempted to videotape Constable Tejeda using part-time constable employees illegally to provide security services at a private facility. Constable Tejeda noticed Keenan and ordered Deputy Constable Martinez to arrest him on a misdemeanor "deadly conduct" charge. Constable Tejeda maintains that Keenan pointed a gun at him. Keenan admits carrying a 9mm pistol in the glove box of his car, but he insists that he

---

[2] Martinez and the other deputy constables have stated in affidavits that they observed a traffic violation, that they did not know who was in the car until one of the deputies asked Przybylski for his driver's license, and that they never drew their weapons. But, given the procedural posture of this case, we view the evidence in the light most favorable to the plaintiffs.

4

was pointing a video camera, not a gun. Keenan was tried on the deadly conduct charge and found not guilty.[3]

In 1999, Keenan and Przybylski filed this § 1983 action against Constable Tejeda, Deputy Constable Martinez, and Bexar County. The plaintiffs alleged that the defendants retaliated against them for speaking out against corruption in the constable's office. The plaintiffs also asserted that the defendants' actions denied them due process and equal protection of the law.

The district court granted summary judgment for the defendants and dismissed the plaintiffs' § 1983 action. The district court ruled that the plaintiffs had no First Amendment claim for retaliation because the defendants' actions did not actually chill the plaintiffs' exercise of their First Amendment rights. The district court emphasized that Keenan and Przybylski were not cowed by Constable Tejeda's campaign of harassment because they helped videotape other illegal activities and filed complaints in 1998 and 1999.

The district court concluded alternatively that the traffic stop and false accusations would not have deterred a person of ordinary firmness from engaging in speech activities. As for

---

[3] Keenan and Przybylski also allege that, at several times during 1997 and 1998, Constable Tejeda and Deputy Constable Martinez ordered or encouraged other employees of Precinct 5 to file false or misleading police reports involving Keenan and Przybylski. Most of these reports appear to have been filed in connection with the traffic stop and deadly conduct incidents. The only other evidence of false statements constitutes inadmissible hearsay.

5

the allegedly false prosecution of Keenan, the court noted that in this circuit, a criminal prosecution in retaliation for the exercise of First Amendment rights must satisfy the standards of malicious prosecution.  Colson v. Grohman, 174 F.3d 498, 513 n.8 (5th Cir. 1999); Johnson v. Louisiana Dept. of Agriculture, 18 F.3d 318, 320 (5th Cir. 1994).  One of those standards is an absence of probable cause to prosecute.  The district court found that the facts alleged by Keenan himself established probable cause for Tejeda to believe Keenan was pointing a gun at him.  The court also found -- erroneously -- that a grand jury indictment had issued, providing a further basis for probable cause.

Having concluded that the plaintiffs could not prevail on their First Amendment retaliation claim, the court did not address further the defendants' affirmative defense of qualified immunity. Nor did the district court analyze the plaintiffs' due process and equal protection claims, presumably because neither side argued those issues in their briefs.

On the question of municipal liability, the district court ruled that Bexar County could not be held liable for the actions of Tejeda and Martinez because Constable Tejeda is not a policy-maker for purposes of Monell liability, and the plaintiffs presented no evidence of a failure to train or failure to supervise.  The plaintiffs have appealed.

## II.  DISCUSSION

6

We review the district court's grant of summary judgment de novo, applying the same substantive standard set forth in FED. R. CIV. P. 56(c).  Horton v. City of Houston, 179 F.3d 188, 191 (5th Cir. 1999).

### A.  First Amendment Retaliation

The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities.  Colson, 174 F.3d at 508.  As this court explained in Colson, if government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly.  Id. at 509-10; Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697 (1972).

Unlike most of this circuit's First Amendment retaliation cases, this case does not involve an employment or other contractual relationship between the plaintiffs and the governmental officials.  The settled law of other circuits, which we endorse, holds that to establish a First Amendment retaliation claim against an ordinary citizen, Keenan and Przybylski must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage

7

in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct. Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001); Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir. 2001); Lucas v. Monroe County, 203 F.3d 964, 973 (6th Cir. 2000). The issues presented by this appeal are concerned exclusively with the second element.

The district court concluded that the defendants' actions, even when viewed in the light most favorable to the plaintiffs, were not so serious as to discourage a person of ordinary firmness from continuing to speak out against corruption in the constable's office. Certainly, some retaliatory actions -- even if they actually have the effect of chilling the plaintiff's speech -- are too trivial or minor to be actionable as a violation of the First Amendment.[4] Colson, for example, involved a city council member who alleged that the police chief and other city officials had retaliated against her because of her criticism of the police department's budget. We held that the defendants' alleged actions constituted, at most, a "steady stream of false accusations and vehement criticism that any politician must expect to endure;" consequently, an ordinary politician would not be

---

[4] In the employment context, this court's requirement of an adverse employment action serves the purpose of weeding out minor instances of retaliation. Colson, 174 F.3d at 510, 514.

8

deterred from continuing to criticize police officials. See Colson, 174 F.3d at 511-14.

In this case, Keenan and Przybylski have presented evidence of two disturbing incidents involving an undercurrent of violence. First, several constables and other officers stopped Przybylski's car in June 1997 and detained both plaintiffs for an inordinate period of time, allegedly with their guns drawn during part of the traffic stop, and ultimately issued only a minor traffic citation that was later dismissed. Second, Keenan was charged with "deadly conduct," a misdemeanor under Texas law, under suspicious circumstances. Keenan was forced to spend thousands of dollars to exonerate himself at trial and, at the time he executed his affidavit, neither his pistol nor his concealed handgun license had been restored to him.

The question, to repeat, is whether a person of ordinary firmness would have been deterred by these ominous events from continuing to criticize the constable. Decisions of this and other circuits have found that various concrete intimidating tactics would have deterred ordinary persons from criticizing government officials. See, e.g., North Miss. Comm., Inc. v. Jones, 951 F.2d 652, 653-54 (5th Cir. 1992)(county board's decision to withhold legal notice advertising); Bloch v. Ribar, 156 F.3d 673, 681 (6th Cir. 1998)(release of confidential information regarding a rape investigation); Nestor Colon Medina & Sucesores, Inc. v. Custodio,

9

964 F.2d 32, 40-41 (1st Cir. 1992)(denial of a land use permit).[5] In light of these decisions, we hold that the actions of the defendants in this case, if proved, are sufficiently intimidating to chill the speech of a person of ordinary firmness.

Also with respect to the second element of the retaliation claim, the district court concluded that Keenan and Przybylski did not actually suffer an injury, inasmuch as they persisted in exposing and challenging the constable. We are mindful that § 1983 is a tort statute and that "[a] tort to be actionable requires injury," which, in this context, is the deprivation of a constitutional right. Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982). At the same time, "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Id. The district court correctly ruled that a retaliation claim requires some showing that the plaintiffs' exercise of free speech has been curtailed. See Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000); Spear v. Town of West Hartford, 954 F.2d 63, 67 (2d Cir. 1992); Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989); but see

---

[5] See also Rolf v. City of San Antonio, 77 F.3d 823, 827-28 (5th Cir. 1996) (rejecting Rule 12(b)(6) dismissal of claim that condemnation of landowners' property was initiated in retaliation for their opposing construction of the Applewhite Reservoir). Courts have not been reluctant to grant summary judgment for hollow or trivial threats of retaliation. See e.g. Smith v. Plati, supra; Sullivan v. Carrick, 888 F.2d 1 (1st Cir. 1989) ("I'm going to get you for this, you little smurf!").

10

<u>Mendocino Environmental Ctr. v. Mendocino County</u>, 192 F.3d 1283, 1300 (9th Cir. 1999)("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity."); <u>Smith</u>, 258 F.3d at 1177 ("The focus . . . is upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled.").

The district court clearly erred, however, in finding that the plaintiffs made no showing of an injury. In his affidavit, Keenan explained that after the incidents in June 1997 and December 1997, he was afraid to travel in Precinct 5 and he "backed off from direct involvement in helping expose unlawful practices" in the constable's office. (Keenan goes on to say, though, that he videotaped one instance of suspected unlawful activity and filed a complaint with a state agency against Constable Tejeda.) Przybylski made similar assertions in his affidavit. Thus, both plaintiffs have stated, without contradiction, that they curtailed their protected speech activities in response to the defendants' actions. At this stage of the litigation, the plaintiffs have sufficiently averred that they were deprived of a constitutional right, even though they were not completely silenced. A required showing of actual injury does not necessarily mean that plaintiffs must cease criticizing the

11

government officials altogether in order to have a claim for retaliation.

Finally, the district court articulated an alternative reason for granting summary judgment with respect to claims arising from the "deadly conduct" charge against Keenan. As noted above, we have held that retaliatory criminal prosecutions in violation of the First Amendment are actionable only if a plaintiff can also prove the common-law elements of malicious prosecution, including the absence of probable cause to prosecute. See Johnson, 18 F.3d at 320; see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government."); Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001). The district court found, however, that Constable Tejeda had probable cause to arrest and that a grand jury indictment removed any doubt of probable cause. The court was wrong about the indictment; there was none.[6] And it found probable cause entirely on Keenan's own statements, accepting those which militated in favor of probable cause and ignoring those which did not.

---

[6] The deadly conduct charge against Keenan was a Class A misdemeanor and not an indictable offense. See Tex. Pen. Code § 22.05(a); Tex. Code Crim. Proc. art. 2.05.

12

The district court incorrectly drew its conclusion on summary judgment despite the existence of fact issues concerning the constable's perception of Keenan's actions. The court emphasized that Keenan indisputably was pointing something at Tejeda and that Tejeda could have believed it was a gun. Probable cause, in the context of malicious prosecution claims, refers to "The existence of such facts and circumstances as would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." Kerr v. Lyford, 171 F.3d 330, 340 (5th Cir. 1999). Constable Tejeda is entitled to summary judgment only if the ultimate finding of probable cause is not the subject of a genuine, material factual dispute. Id. But the only fact supporting the deadly conduct charge is Constable Tejeda's own assertion that "I am a trained law enforcement officer, and I know a gun when I see it." Neither of the other two officers present saw Keenan point a gun. (Deputy John Rothenbach stated in his affidavit that he told Constable Tejeda that he thought he had seen Keenan drive by earlier in the evening.) Chief Deputy Lacey and another deputy conducted a re-enactment about a week after the arrest, and they concluded it was unlikely that Constable Tejeda could have seen someone in a moving vehicle and in the dark pointing a gun at him. Moreover, the manner of the arrest – Keenan was not hand-cuffed for quite some time; the pistol was removed

13

from his glove compartment; knives may have been planted in his vehicle as additional incriminating evidence – may suggest that he was not viewed as a threat despite the nature of the charge eventually filed. For summary judgment purposes, there are genuine issues of material fact concerning whether the deadly conduct charge lacked probable cause.

## B. Qualified Immunity

Whether a government official is entitled to qualified immunity, to the extent that it turns on a question of law, is a question that we review de novo, even where the district court has not passed on the objective reasonableness of the defendants' actions. See, e.g., Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 376-77 (5th Cir. 2000).

The Supreme Court recently emphasized that claims of qualified immunity require a two step analysis. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2155 (2001). The threshold question is "whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right." Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001)(citing Saucier, 533 U.S. at 201, 121 S.Ct. at 2156). Viewing the facts in the light most favorable to Keenan and Przybylski, the defendants' actions violated the First Amendment. As we discussed above, Keenan and Przybylski were engaged in constitutionally protected activity and suffered an injury that

14

would chill a person of ordinary firmness. Further, because it is reasonable to assume (at this stage of the litigation) that the "Constable Cash" broadcast was both politically and financially damaging to Constable Tejeda and his deputies, and because the harassment followed a few months after the report was aired, there is sufficient evidence that the defendants' actions were substantially motivated as a response to the plaintiffs' exercise of protected conduct.

The next question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202, 121 S.Ct. at 2156. If the officer's conduct was objectively reasonable in the light of clearly established federal law, he is entitled to qualified immunity from suit. This court has stated that government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable. <u>Rolf</u>, 77 F.3d at 828.[7] The <u>Rolf</u> case did not, however, consider a situation in which law enforcement officers might have a motive to retaliate but

---

[7] In some cases, the balancing of rights required by the First Amendment – either to determine what constitutes protected speech or to balance, <u>e.g.</u>, the public employee's rights against those of the employer – strongly favors qualified immunity. <u>See</u> <u>Noyola v. Texas Dept. of Human Resources</u>, 846 F.2d 1021, 1025 (5th Cir. 1988). In this case, however, the protected nature of appellants' speech is undisputed. And if a jury finds that the constable and deputy constable were substantially motivated to and did deter appellants' efforts to expose official misconduct, then there is no immunity shield for their obvious wrongdoing. Such official intimidation strikes at the heart of First Amendment freedoms.

15

there was also a ground to charge criminal conduct against the citizen they disliked.  In that situation, the objectives of law enforcement take primacy over the citizen's right to avoid retaliation.  See Mozzochi, 959 F.2d at 1179.  The test for qualified immunity, therefore, involves, though it does not end with, the question of probable cause.  If no reasonable police officer could have believed that probable cause existed for the law enforcement actions of Tejeda and Martinez against the plaintiffs, then their retaliation violated clearly established law in this circuit.  See Rolf, 77 F.3d at 828; compare Click v. Copeland, 970 F.2d 106, 109 (5th Cir. 1992).  If probable cause existed, however, or if reasonable police officers could believe probable cause existed, they are exonerated.  Based on the several diametrically opposed summary judgment affidavits before us, it is impossible to determine whether qualified immunity stated in terms of probable cause existed.  Hence, qualified immunity turns on fact issues that must be resolved by further proceedings in the trial court. Behrens v. Pelletier, 516 U.S. 299, 312-13, 116 S.Ct. 834, 842 (1996).

### C.  Due Process and Equal Protection

Keenan and Przybylski included due process and equal protection claims in their complaint, and they have briefed these issues on appeal.  These issues have not been preserved.  Due process and equal protection were not even mentioned, much less

16

argued, in the defendants' motion for summary judgment, in the plaintiffs' response to the motion for summary judgment, or in the district court's memorandum opinion granting summary judgment. Nor did the plaintiffs file a motion for reconsideration following the court's dismissal of the entire action. Because the due process and equal protection arguments were not properly presented to the district court, we may not consider them here. In a factually analogous case, the First Circuit explained:

> Even an issue raised in the complaint but ignored at summary judgment may be deemed waived. "If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal." This is because "an appellate court, in reviewing a summary judgment order, can only consider those matters presented to the district court."

Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995)(quoting Vaughner v. Pulito, 804 F.2d 873, 877 n. 2 (5th Cir. 1986), and Frank C. Bailey Enterprises, Inc. v. Cargill, Inc., 582 F.2d 333, 334 (5th Cir. 1978). The summary judgment is therefore affirmed with respect to the plaintiffs' due process and equal protection claims.

### D.   Monell liability

The final issue is whether the district court erred in granting summary judgment for Bexar County. A government entity may be held liable under § 1983 only when the injury results from the "execution of a government's policy or custom, whether made by

17

its lawmakers or by those whose edicts and acts may fairly be said to represent official policy." Monell v. Deparment of Social Services, 436 U.S. 658, 694 (1978). Keenan and Przybylski present three arguments for subjecting Bexar County to Monell liability, none of which is persuasive.

First, Keenan and Przybylski contend that Constable Tejeda had policy-making authority for the county and, consequently, that his decision to retaliate against the plaintiffs may fairly be said to represent the county's official policy. Whether a county constable in Texas possesses final policy-making authority for purposes of Monell liability is a question of state law. McMillian v. Monroe County, Alabama, 520 U.S. 781, 786 (1997). In a case involving an unlawful arrest, this court held unambiguously that, under Texas law, Texas county constables are not considered policy-makers in the area of law enforcement. Rhode v. Denson, 776 F.2d 107, 108-10 (5th Cir. 1985)("We are unpersuaded that a constable of a Texas county precinct occupies a relationship to the County such that his edicts or acts may fairly be said to represent official county policy."). Pursuant to Rhode, Constable Tejeda cannot be considered a policy-maker for Bexar County.

Second, Keenan and Przybylski contend that the June 1997 traffic stop was the result of the county's "zero tolerance" policy with respect to traffic violations on Southwest Military Drive. According to this joint city-county policy, all Bexar County

18

officers -- whether from the sheriff's office, constable's office, or city police department -- were instructed to issue citations for all violations that the officers observed.  Keenan and Przybylski suggest that the county policy provided a pretext for Constable Tejeda's and Deputy Martinez's decision to harass them.  This argument fails because the appellants do not complain about the citation itself as much as the intimidating tactics and the length of the detention, neither of which is attributable to the county's "zero tolerance" policy.  More fundamentally, though, the plaintiffs have not established the kind of "affirmative link" between a clearly permissible county policy and the alleged injuries that is required by our <u>Monell</u> caselaw.  <u>See</u> <u>Stokes v. Bullins</u>, 844 F.2d 269, 272-73, 276 (5th Cir. 1988)(citing <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 822-24 (1985)); <u>see</u> <u>also</u> <u>Board of County Comm'rs of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 404 (1997)("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.").

Third, Keenan and Przybylski contend that the county may be held liable for its inadequate training and supervision of its constables and deputy constables.  <u>See</u> <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 389 (1989)("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality .

19

. . can a city be liable for such a failure under section 1983."). The plaintiffs presented no evidence of lack of training, supervision or deliberate indifference.

### III. CONCLUSION

We conclude that the district court erred in granting summary judgment for the defendants, Constable Ruben Tejeda and Deputy Constable Joseph Martinez, on the plaintiffs' First Amendment claim. Moreover, there are fact issues regarding the appellees' qualified immunity on this claim. In all other respects, the judgment is affirmed. The case is remanded for further proceedings not inconsistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**