**DICKINSON LEISURE INDUSTRIES, INC. and John Hill, Plaintiffs,**

v.

**CITY OF DICKINSON, Defendant.**

**No. CIV.A. G–02–433.**

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 27, 2004.

Anthony P Griffin, Attorney at Law, Galveston, TX, for Dickinson Leisure Industries, Inc., John Hill, plaintiffs.

John Joseph Hightower, Olson & Olson, Houston, TX, for City of Dickinson, Texas, defendant.

*ORDER GRANTING IN PART AND DE-NYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDG-MENT*

KENT, District Judge.

In this federal question case, Plaintiffs Dickinson Leisure Industries, Inc. ("DLI") and John Hill (collectively "Plaintiffs") allege that Defendant the City of Dickinson, Texas ("the City" or "Defendant") violated their constitutional rights by taking DLI's property without just compensation in violation of the Fifth Amendment and by retaliating against Hill for his protected First Amendment activities. Now before the Court comes Defendant's Motion for Summary Judgment, which alleges that DLI's Takings claim is not ripe for adjudication and that no genuine issue of material fact exists in Hill's First Amendment retaliation claim. For the reasons stated below, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

I. Background

This case begins with the long decline of the Dickinson Country Club ("DCC"). Founded in the 1950s, DCC never turned a profit. DCC's difficulties sprang, at least in part, from its limited physical resources. DCC owned a nine-hole golf course, but it lacked, among other amenities, a driving range or tennis courts. DCC had also lost part of its property in a forced sale to the Texas Department of Transportation for the construction of a drainage ditch. Apparently at the urging of DCC's shareholders and neighbors, Hill formed DLI in 2000 for the sole purpose of purchasing and managing DCC. In May or June, 2000, DLI purchased DCC, which consisted of roughly 95 acres of land and various buildings, for $660,000. At the time DLI purchased DCC, the restaurant had been closed, the pro shop was empty, the buildings were infested with termites,

the Club's equipment was in disrepair, the golf carts were old, and the golf course needed maintenance. *See* Deposition of John William Hill III, Plaintiffs' Exh. 13 ("Hill Deposition"), at 63:10–25; 64:1–18. To improve DCC's limited prospects, DLI formulated a business plan involving diversification of the activities on DCC's property as well as improvement and expansion of its physical plant. DLI christened the new entity the Dickinson Golf & Yacht Club ("DGYC"). In October 2000, DLI initiated efforts to purchase an additional 14.52 acre tract of land adjacent to the existing DGYC property.[1] In February 2001, DLI entered an agreement to purchase the additional land. DLI invested a total of approximately one million dollars in the development of DGYC before the club closed.

Zoning is a twenty-first century phenomenon in the City of Dickinson. The Dickinson City Council first discussed the adoption of a zoning ordinance at a public meeting in December 1999. On January 25, 2000, the Mayor of Dickinson appointed a fifteen-member zoning steering committee. On March 28, 2000, the City hired Wilbur Smith & Associates ("WSA"), a municipal planning and zoning consultant, to help formulate and adopt a zoning ordinance. In October 2000, WSA presented a land-use inventory to the City zoning steering committee. In December 2000, WSA submitted a preliminary zoning map. In the preliminary zoning map, WSA rec-

ommended that the City include the DGYC property in a residential zone.[2]

Before DLI had completed the purchase of the additional 14.5 acre tract, Hill became aware that the proposed zoning ordinance included both the DGYC property and the additional tract within a residential zone. Hill made several efforts to change the City's designation of DGYC property as residential. On April 2, 2001, Hill wrote a letter to Ivan Langford, the City Manager, requesting his assistance in correcting the proposed zoning regulation for DGYC's property. *See* Letter from John Hill to Ivan Langford, April 2, 2001, Plaintiffs' Exh. 7. The letter catalogued the improvements made to the property, its then-current nonconforming uses (including a restaurant, a bar, event facilities, recreational boating facilities, and RV facilities), and the planned expansion of such uses. *See id.* In essence, the letter argued that residential zoning was inconsistent with DGYC's current use and future plans, *see id.* at 1 ("We are simply not residential."), and it requested that DGYC be zoned light commercial. *See id.* at 4. Hill claims that he did not receive any response to this letter. *See* Hill Deposition at 109:19–24.

On April 10, 2001, Hill and the prospective seller of the additional tract appeared before the City Council and asked that the property be zoned commercial. *See* City Council Minutes, April 10, 2001, Plaintiffs' Exh. 3, at 3. At this meeting, Hill indicated to the City Council that he intended to

---

1. Plaintiffs state that the additional tract measured 14.52 acres. *See* Hill Deposition at 68:1–9. In its Motion for Summary Judgment, the City describes the additional tract as 19.5 acres. Because no issue turns on the size of the additional tract, and for the sake of convenience, the Court will refer to the tract as measuring 14.5 acres.

2. In its Motion for Summary Judgment, the City maintains that DGYC was included in a

residential zone for the following reasons: (1) the area in which the property was located lacked the infrastructure necessary to support commercial development; (2) the prevailing land use in the area was low-density residential; and (3) the proposed zoning ordinance would allow golf courses and accessory uses by specific use permit in residential districts. *See* Affidavit of Bret C. Keast, Defendant's Exh. 6, at 2.

turn the DCC property into a resort. *Id.* ("John Hill, owner of Dickinson Country Club, asked his property be zoned commercial. He is hoping to add to his club with a motor coach park on [highway] 517 to help create a resort."). According to Hill, the City Council indicated to Hill that they saw no problem with DLI's business plan and that the City would do what was necessary to help. *See* Hill Deposition at 71:7–73:5. Later in the summer of 2001, Hill claims that he had a "somewhat heated" telephone conversation with Langford, in which he requested that the DGYC property be zoned commercial. *See id.* at 74:14–76:12.

On July 24, 2001, the City adopted Zoning Ordinance No. 420–2001 ("the Ordinance"), which listed DLI's property as Conventional Residential. The Ordinance describes Conventional Residential zoning as follows:

> The zoning of property as "CR" Conventional Residential is intended to provide for conventional detached single-family dwellings. The purpose of the "CR" district is to provide for development of areas where adequate public facilities exist, and residential development is appropriate given the surrounding land uses and neighborhood.

Ordinance 420–2001, Plaintiffs' Exh. 1, § 18–50, at 32. The Ordinance permits the following uses in Conventional Residential zones: "accessory residential uses," agricultural uses, "[c]onventional detached single-family residences," "home occupations incidental to a residential permitted use," "[p]rivate recreational facilities owned and operated by or on behalf of a residential subdivision or development," and "Specific Use permitted pursuant to Article V." *Id.* Article V of the Ordinance provides that a specific use permit for a recreational vehicle park will be granted only in General Commercial zones. *See id.*

§ 18–58, at 50–51. Although it permits golf courses to operate in Conventional Residential zones Specific Use Permits, Article V does not list specific uses for health clubs or spas, restaurants, or yachting facilities. *See id.*

Plaintiff infers from Article V's failure to mention these specific uses that no specific use permit could be obtained under the Ordinance for health clubs or spas, restaurants, or yachting facilities within a Conventional Residential zone. *See* Plaintiffs' Response at 10. Keith Kiplinger, the Fire Marshal and Director of City Development for the City of Dickinson, agreed that specific use permits were not available for restaurants, health clubs, or yachting facilities within a Conventional Residential zone, though he did state that the Ordinance permitted existing nonconforming uses to continue for an indefinite period. *See* Deposition of Keith Kiplinger, Plaintiffs' Exh. 21, at 17:18–18:14. At the time the City enacted the Ordinance, DGYC contained a golf course and pro shop, lighted beach volleyball facilities, the Bayou Bend Restaurant, the Outback Deck Club, a boat dock, and a swimming pool with a bathhouse and Jacuzzi. DLI planned to add tennis courts, a driving range, and a complete RV park.

After the City enacted the Ordinance, Plaintiffs attempted to remedy what they perceived to be an incorrect designation of their property. In August 2001, DLI sent the City a letter, to which it apparently did not respond. Hill alleges that DLI retained an engineer to resolve the zoning issue with the City. DLI's engineer met with the City and outlined DLI's proposed expansion of DGYC. The City responded that it would not change the zoning to General Commercial. Plaintiffs allege that, as a result of DLI's failure to secure a more favorable zoning designation, its investors abandoned the venture on or

about February 14, 2002. On February 28, 2002, DLI closed DGYC, Bayou Bend Restaurant, and the Outback Deck, all of which had been operating on DLI's property. Following the cessation of business operations at DGYC, DLI's counsel sent a second letter to the City, which outlined the damages suffered by DLI and demanded the City rezone the property and pay DLI one million dollars to cover the cost of reopening the businesses at DGYC. *See* Letter from William Bennett to Dickinson City Secretary, March 13, 2002, Plaintiffs' Exh. 8.

On June 18, 2002, DLI submitted an application for a zoning change to the 14.5 acre tract adjacent to the original DCC property. *See* Zoning Change Application, Plaintiffs' Exh. 9. In its application, DLI requested that the parcel be rezoned General Commercial so that DLI could construct a driving range, a fitness center, tennis courts, and RV spaces. *Id.* After a public hearing, the Planning & Zoning Committee recommended that the parcel be rezoned General Commercial and drafted an ordinance to that effect. *See* Planning & Zoning Staff Review, Plaintiffs' Exh. 11. Although some members of the City Council expressed concern that no site plan had been submitted, they were assured that a rezoning application did not require a site plan, and the rezoning ordinance passed after the third reading.

On July 16, 2002, DLI submitted a zoning change application for the original DCC property, requesting that it be zoned General Commercial. The application maintained that the initial zoning designation did not reflect the usage of the property and violated the City's zoning ordinance. *See* Zoning Change Application, Plaintiffs' Exh. 10. The City held a public hearing on the rezoning application. Councilman Mike Reinschmidt circulated a petition against this zoning request, which was signed by a number of individuals who lived near DGYC. *See* Plaintiffs' Exh. 5. Although the petition expressed the signers' general approval of DLI's plans for DGYC (with the exception of certain RV spaces), the petition opposed rezoning the property as General Commercial. This opposition to rezoning was based on the concern that, if DGYC failed, the neighboring property owners would have no protection against the development of new businesses that might adversely affect the neighborhood. The petition strongly urged the City and the Zoning Committee to cooperate with Hill and DLI to resolve the development issue without changing the zoning of DGYC's property. The Planning & Zoning Commission recommended denial of the zoning change for the original DCC property.

Around the same time that the City was formulating its zoning ordinance and DLI was revitalizing DGYC, the regulation of Sexually Oriented Businesses (SOBs) came to the forefront of public debate in Dickinson. At all times relevant to this lawsuit, Heartbreakers was the only SOB in Dickinson. In early 2001, Hill became a vocal supporter of Heartbreakers. He signed a petition against the City's SOB ordinance, he permitted Heartbreakers to put up a sign at DGYC, and he wrote a number of e-mails opposing the ordinance. Hill also wrote several newspaper editorials against then-Mayor Hufstedler and against the City's position on the SOB ordinance. Hill signed and collected signatures for recall petitions against Mayor Hufstedler and against a member of the City Council.

Hill alleges that, as a result of his public stance against the City, he was unfairly targeted by the City. Hill alleges that the Dickinson police tried to arrest him for disorderly conduct. He alleges that the police ticketed him for excessive noise at DGYC and that the charge was later dis-

missed. Hill alleges that the officer who issued the ticket later apologized to him, told Hill that he had been specifically ordered to ticket him, and urged Hill to take legal action against the City. Hill maintains that the City zoned DGYC differently than the other golf courses in Dickinson, and he attributes the inconsistent zoning to retaliation by the City. Hill alleges that ex-Mayor John Michener, current Mayor Veta Winick, and current Councilman Lewis Decker told him that his "zoning problems were a result of his public stance." Plaintiffs' Response at 19.

Plaintiffs filed their Original Complaint in this Court on June 17, 2002. Plaintiffs asserted claims under 42 U.S.C. § 1983 for a taking of property without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution and for unlawful retaliation against protected activity in violation of the First Amendment. On November 5, 2003, the City filed its Motion for Summary Judgment, in which it moved to dismiss the Fifth Amendment takings claim without prejudice on ripeness grounds, and which moved to dismiss the First Amendment retaliation claim with prejudice.

## II. Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party must come forward with "specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e), *quoted in Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must view all evidence in the light most favorable to the non-movant. *See, e.g., Broussard v. Parish of Orleans,* 318 F.3d 644, 650 (5th Cir.), *cert. denied, Dazet v. Foster,* 539 U.S. 915, 123 S.Ct. 2276, 156 L.Ed.2d 130 (2003). If the evidence would permit a reasonable fact finder to find in favor of the non-moving party, summary judgment should not be granted. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III. Analysis

### A. Takings Claim

■ The City argues that because Plaintiffs did not register their nonconforming use or apply for a Specific Use Permit, they have failed to exhaust their administrative remedies, and the claim is not ripe for adjudication. Ripeness doctrine is intended to ensure that claims are properly framed for adjudication before they reach the federal courts. *See, e.g., Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (stating, in the context of a challenge to federal administrative regulations, that ripeness doctrine prevents courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties").

■ As applied to regulatory takings claims, ripeness doctrine includes two components: (1) The plaintiff must demonstrate that the governmental entity

charged with an unlawful taking has "reached a final decision regarding the application of the regulations to the property at issue," *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985); and (2) the plaintiff must seek just compensation through the procedures established by the state. *See Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 734, 117 S.Ct. 1659, 1665, 137 L.Ed.2d 980 (1997). The first requirement stems from the basic principle, articulated by Justice Holmes, "that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal. Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (Holmes, J.). This principle obviously places great weight on the question whether a particular regulation "goes too far." As Justice Stevens later remarked,

> It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone "too far" unless it knows how far the regulation goes.

*MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986). The second component of the ripeness requirement draws on the language of the Fifth Amendment itself, which provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V. The dual requirements of the Fifth Amendment—taking of property and denial of just compensation—mean that "if a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until

it has used the procedure and been denied just compensation." *Suitum*, 520 U.S. at 734, 117 S.Ct. at 1665 (quoting *Williamson County*, 473 U.S. at 195, 105 S.Ct. at 3121).

### 1. Final Decision

 The first prong of the ripeness analysis focuses on the question whether the City's denial of Plaintiffs' request to rezone the bulk of DGYC's property constituted a final decision within the meaning of *Williamson County*. As a general rule, the final decision requirement obligates a plaintiff to seek approval of or permission for the proposed use of its property from the relevant governmental unit. *See Williamson County*, 473 U.S. at 190, 105 S.Ct. at 3118 (holding that the plaintiff failed to present a ripe takings claim where it had neither followed the procedure for obtaining a variance nor provided "specific information about the variances it would require"); *see also Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) ("Because the appellants have not yet submitted a plan for the development of their property as the ordinances permit, there is as yet no concrete controversy regarding the application of the specific zoning provisions."). The requirement that the government make a final decision does not, however, obligate a plaintiff to take futile measures to secure relief. *See, e.g., Palazzolo v. Rhode Island*, 533 U.S. 606, 626, 121 S.Ct. 2448, 2462, 150 L.Ed.2d 592 (2001) (holding that federal ripeness doctrine did not require a landowner to make further application when the rejection of his prior applications made clear the extent of development that the land-use regulation permitted); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1012 n. 3, 112 S.Ct. 2886, 2891 n. 3, 120 L.Ed.2d 798 (1992) (finding that submission of a development plan would have been "pointless" and finding a ripe

claim where the governmental entity stipulated that a building permit would not have issued under a regulation that prohibited all construction on the landowner's property).

Plaintiffs do not dispute that DLI never registered their nonconforming uses or applied for Specific Use Permits. They maintain, however, that the relevant provisions of the Ordinance rendered such measures futile and that the denial of their application for rezoning was tantamount to a final decision regarding their particular development plans. Plaintiffs bridge the logical gap between the denial of its rezoning application and the futility of an application for approval of their specific plans by pointing to Article V of the Ordinance, which governs Specific Use Permits. Plaintiffs emphasize that a number of the components of their planned development—notably restaurants, health clubs, and yacht clubs—are not included in the list of specific uses for which a permit may issue under the Ordinance. *See* Ordinance Article V § 18–58, Plaintiffs' Exh. 1, at 50–51. Plaintiffs conclude from Article V's failure to include certain specific uses that the Ordinance does not permit Specific Use Permits to issue for such uses.

Furthermore, Plaintiffs argue that even if they had received Specific Use Permits from the City, the zoning regulation prohibited them from expanding their operations. The Ordinance establishes the following rules for nonconforming uses:

2. *Movement, alteration and enlargement.* No nonconforming use may be moved, enlarged or altered and no nonconforming use of land may occupy additional land, except as follows:

a. *Enlargement*—A nonconforming use may not be enlarged, expanded or extended to occupy all or part of another structure or land site that it did not occupy on the effective date of the provisions of this chapter.... The enlargement, expansion or extension of a nonconforming residential use shall be excepted from this limitation, ....

b. *Exterior or interior remodeling or improvements to structure*—Exterior or interior remodeling or improvements to a structure containing a nonconforming use shall be allowed, provided there is no expansion of the nonconforming use.

3. *Destruction of structure with nonconforming use.* If a structure that contains a nonconforming use is destroyed to the extent of fifty (50) percent or more of its appraised value by fire or natural calamity or is voluntarily razed or is required by law to be razed, the nonconforming use shall not be resumed.

Ordinance § 18–111, Plaintiffs' Exh. 1, at 82–83. This provision is crucial to the ripeness analysis. The essence of Plaintiffs' claim is that the City's decision to zone DGYC residential ignored the clear existing use of the property and contradicted the City's own articulated standards for its zoning decisions. By refusing to grant them relief from the improper zoning, Plaintiffs allege that the City effectively reached a final decision regarding DGYC's future expansion. The above-cited provision of the Ordinance unambiguously states that DLI could not expand any of the nonconforming uses that existed at DGYC on the date the Ordinance went into effect. A Specific Use Permit would only permit DGYC to continue its existing nonconforming uses. While the reach of Article V—and thus the availability of Specific Use Permits for DGYC—remains unresolved, a decision in DLI's favor would not change the fact that the Ordinance clearly prohibits the expansion of DGYC's existing facilities. This expansion was a key component of DLI's business plans. Plaintiffs thus show that the City's zoning

regulations caused them to suffer a legal injury regardless of the hypothetical resolution of the ambiguous provisions of Article V.

Ripeness is a largely prudential doctrine designed to ensure that controversies are properly framed for adjudication before they reach the federal courts. It comes as no surprise, then, that ripeness often entails a fact-based inquiry. The factual background of this lawsuit could, on balance, lead a reasonable person to believe—as Plaintiffs clearly did—that any further efforts to secure the City's approval for their project would have been futile. Plaintiffs have certainly alleged sufficient facts to support the inference that the City was not inclined to do them any favors. The first prong of ripeness inquiry in this case turns on a single question: whether the foreclosure of DGYC's prospects of future expansion resulted from a "final decision" by the City or by DLI's own decision to abandon its efforts before it had exhausted all avenues of relief. While there is a genuine question of fact whether, under Article V, DLI could have secured Specific Use Permits for all of DGYC's existing uses, other provisions of the Ordinance clearly foreclosed future expansion of DGYC's facilities. When the City denied Plaintiffs' appeal of the zoning decision, it rendered a final decision regarding the viability of DLI's business plan. Accordingly, Plaintiffs have satisfied their burden of showing that a final decision by the City caused their alleged injury.[3]

### 2. Just Compensation

■ The City also argues that Plaintiffs' takings claim is unripe because they did not follow existing state procedures to seek just compensation for the alleged taking. Defendant argues that the State of Texas has adequate remedies available for takings claims, see *John Corp. v. City of Houston*, 214 F.3d 573, 581 (5th Cir.2000) (accepting the district court's determination that state-provided procedures for seeking just compensation were adequate), and that Plaintiffs failed to pursue these remedies before filing their claim in federal court. Accordingly, Defendant argues that the claim is not ripe, and the Court lacks subject-matter jurisdiction. Plaintiffs respond that, contrary to Defendant's argument, they sought and were denied just compensation by the City. Plaintiffs point to a letter from their attorney to the City dated March 13, 2003, which demands compensation under the Texas Constitution and the U.S. Constitution for the unlawful taking of DLI's property.

The facts clearly show that Plaintiffs specifically demanded just compensation from the City in a formal writing that invoked applicable state and federal law. The Court agrees that the City's refusal to answer Plaintiffs' letter constitutes a refusal to compensate Plaintiffs for their alleged loss. The only question is whether Takings Clause ripeness doctrine requires that a plaintiff seek just compensation through the specific mechanisms *provided by state law* for that purpose. The common formulation of Takings Clause ripeness doctrine speaks of "procedures the State has provided." *Suitum*, 520 U.S. at 734, 117 S.Ct. at 1665 (quoting *Williamson County*, 473 U.S. at 194, 105 S.Ct. at 3120). Defendant argues, based on the repeated

**3.** The Court expresses no opinion whatsoever regarding the viability of Plaintiffs' takings claim. Because Defendant did not move for summary judgment on the merits of the Fifth Amendment claim, the Court assumes for the purposes of this Order that a genuine issue of material fact exists on the question whether the City's zoning activities constituted a regulatory taking.

reference to state law in Takings Clause cases, that a plaintiff must file an inverse condemnation suit in state court before it may file a takings claim in federal court.

 While the Fifth Amendment clearly provides that a taking of property for public use is not unlawful unless the government denies compensation, the Court perceives no basis in the Just Compensation Clause for the proposition that a plaintiff must seek compensation exclusively through *state*-created remedies when a *municipality* has committed the allegedly unlawful taking. To impose a blanket requirement that a plaintiff first pursue available state-created remedies in state court before filing a Fifth Amendment takings claim against a municipality in federal court would contradict the well-established principle that a plaintiff need not exhaust state remedies before seeking relief under federal law. *See Patsy v. Bd. of Regents of State of Florida,* 457 U.S. 496, 500–01, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) ("[T]his Court has stated categorically that exhaustion is not a prerequisite to an action under § 1983 . . . ."); *Woods v. Smith,* 60 F.3d 1161, 1165 (5th Cir.1995) ("[I]t is clearly settled that, except for the limited exception Congress has established, exhaustion of state judicial or administrative remedies is not a prerequisite to the bringing of a section 1983 claim.").[4] Thus, despite the focus on state-created remedies in cases such as *Williamson County,* a plaintiff fulfills the purpose of the Just Compensation Clause by unsuccessfully seeking compensation from whatever governmental entity committed the allegedly unlawful taking. The Fifth Amendment refers to the denial of just compensation, not to state courts or state-created reme-

dies. Because the facts clearly show that Plaintiffs sought compensation from the City, the Court finds that Plaintiffs have satisfied the second ripeness requirement.

Because Plaintiffs have demonstrated that a final decision by the City caused their alleged injury, and because they sought and were denied compensation by the City, the Court finds that Plaintiffs' takings claim is ripe for adjudication. Accordingly, Defendant's Motion for Summary Judgment on the takings claim is hereby respectfully **DENIED.**

### B. First Amendment Retaliation Claim

 Plaintiff Hill maintains that the City retaliated against Hill for his protected First Amendment activity by including DLI's property in a residential zone. Specifically, Hill maintains that the City improperly zoned DLI's property Conventional Residential in retaliation for his public comments in support of Heartbreakers, a sexually oriented business ("SOB") located in Dickinson. To establish a First Amendment retaliation claim in an "ordinary citizen" case—that is, a case that does not involve an employment or contractual relationship between the plaintiff and the government—a plaintiff must show (1) that he engaged in constitutionally protected activity, (2) that the defendant's actions caused "an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) that the actions complained of were "substantially motivated" by the plaintiff's protected activity. *Keenan v. Tejeda,* 290 F.3d 252, 258 (5th Cir.2002). To defeat a plaintiff's prima facie First Amendment retaliation claim, a defendant must show that it would have taken the same action

---

**4.** The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), requires prisoners to exhaust "such administrative remedies as are available" before filing a § 1983 suit objecting to

state prison conditions; however, this exception to the general rule obviously does not apply to this case.

regardless of the plaintiff's protected conduct. The Parties agree that Hill's speech in support of Heartbreakers was protected by the First Amendment; therefore, Plaintiffs' prima facie case turns exclusively on the second and third elements. Whether the claim can survive summary judgment also depends on whether Defendant can show that it would have taken the same actions regardless of Hill's protected activity.

█ Hill claims that the City caused him to suffer two injuries. First, he alleges that the Dickinson police ticketed him for a noise violation, which was later dismissed. Second, he claims that the City's placement of DGYC in a Conventional Residential zone destroyed his business. With respect to the latter injury, Hill alleges that the City's zoning decision was inappropriate under the terms of the Ordinance and that other golf courses in Dickinson were "zoned differently" than DGYC. See Plaintiffs' Response at 12. In Keenan v. Tejeda, the plaintiffs, former employees of a Bexar County constable, exposed questionable practices by the constable's office to the district attorney and a local television station. Keenan, 290 F.3d at 256. The plaintiffs alleged two instances of retaliation: first, several officers stopped their car and detained them "for an inordinate period of time, allegedly with their guns drawn during part of the traffic stop, and ultimately issued only a minor traffic citation that was later dismissed"; and second, one of the plaintiffs was charged with deadly conduct "under suspicious circumstances" and "forced to spend thousands of dollars to exonerate himself at trial." Id. at 259. The Fifth Circuit reversed the district court's grant of summary judgment, holding that the defendant's actions were "sufficiently intimidating to chill the speech of a person of ordinary firmness." Id. The Fifth Circuit

emphasized the element of violence in the roadside stop and the fact that one plaintiff had to defend himself at trial against serious charges involving the use of a weapon. See id. (describing the allegedly retaliatory actions as "disturbing incidents involving an undercurrent of violence"). The actions taken by the Dickinson police pale in comparison. Unlike the plaintiffs in Keenan, Hill was not threatened with violence or detained for an unreasonable period. Nor was he forced to defend himself at trial against a suspicious and serious charge. The City issued Hill a ticket for a noise violation, and the charge was immediately dismissed. While the Court sympathizes with the inconvenience and frustration caused by a baseless citation, the City's actions did not carry the threat of serious punishment, and they did not require Hill to spend a significant amount of time or money on his own defense. The Court concludes that a ticket for a minor infraction, quickly dismissed, is not sufficiently intimidating to chill the speech of a person of ordinary firmness.

█ With respect to the zoning injury, on the other hand, the Court cannot say as a matter of law that an adverse zoning decision would not chill a person of ordinary firmness from exercising his or her right to engage in protected First Amendment activity. A municipality's police power carries with it the ability to significantly and detrimentally affect the lives and economic well-being of its citizens. It seems obvious that if a municipality were to use its police power to purposefully undermine a citizen's livelihood, a citizen of ordinary firmness would think twice about exercising his or her right to oppose the municipality on a matter of public debate. Generally speaking, it is reasonable to assume that the threat of a zoning decision that would interfere with an individual's business would deter a citizen of ordinary

firmness from persisting in political speech against a municipality. Therefore, regardless of whether the City's zoning decision was motivated by Hill's public speech, Hill has satisfied his burden of proving a cognizable First Amendment injury.

█ Hill fails, however, to establish that the City's actions were substantially motivated by his protected activity. Hill offers the statements of four individuals to bridge the causal gap between his protected activity and his injuries. First, he states that ex-Mayor John Michener, current Mayor Veta Winick, and Councilman Lewis Decker told Hill that "his zoning problems were a result of his public stance." Plaintiffs' Response at 19 (citing Hill Deposition, Plaintiffs' Exh. 13, at 123:21–136:13). Second, he states that ex-Councilman James Deats told him that then-Mayor Hufstedler "had a 'crackdown list' on those who had opposed him." *Id.* Hill's deposition testimony does not suggest that these individuals had personal knowledge that the City's zoning decisions were motivated by Hill's public stance against the City administration. At best, the third-party statements related by Hill amount to speculation.

█ More importantly; the statements offered by Hill are manifestly hearsay and therefore not competent summary judgment evidence. *See, e.g., Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial."). The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). To support his allegation that the City retaliated against him, Hill offers the out-of-court statements of four individuals to prove the truth of the

matters asserted—that Hill's zoning problems resulted from his public stance and that the Mayor had a "crackdown list." The proffered statements do not fall within any hearsay exception or exclusion. By emphasizing the declarants' status as City officials, Plaintiffs implicitly suggest (though Plaintiffs do not explicitly address the hearsay issue) that the statements may qualify as statements by the City itself or by its authorized agents, thus invoking the hearsay exclusion for admissions by a party-opponent. *See* Fed.R.Evid. 801(d) ("A statement is not hearsay if ... [t]he statement is offered against the party and is (A) the party's own statement ... or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship ...."). Although Plaintiffs characterize all of the hearsay declarants as current or former City officials, they do not indicate that any of the declarants came to have personal knowledge that the City retaliated against Hill and DLI in the course and scope of their official duties. Accordingly, the third-party statements are hearsay, and they are not proper summary judgment proof.

The substance of Hill's allegations causes the Court considerable apprehension based on the maxim that where there's smoke, there's fire. Similarly, *it is not above the Court's concern* that small-town politics often resembles major league hardball. The Court makes no comment on the veracity of Hill's statements, but without anything more than hearsay statements, Hill's allegations are simply unsupported by any evidence that this Court can properly consider. Because Hill offers no admissible evidence to support his claim that the City's actions were motivated by his protected speech, he cannot state a

prima facie case of First Amendment retaliation.

■ Even assuming that Hill could support each element of his prima facie retaliation claim, the City has shown that it would have made the same zoning designation with respect to DGYC regardless of Hill's public stance on SOBs in Dickinson. In response to Hill's allegation that the City's zoning decision was somehow inappropriate, the City notes that the Ordinance expressly permitted golf courses to operate in residential zones; therefore, the initial zoning decision was entirely consistent with the terms of the Ordinance. *See* Ordinance, Article V § 18–58, Defendant's Exh. 3, at 50–51. In response to Hill's argument that other golf courses in the City were "zoned differently than DLI," *see* Plaintiffs' Response at 12, the City notes that, in fact, all golf courses in the City were included in residential zones. *See* Langford Deposition, Plaintiffs' Exh. 14, at 30:19–31:4. The only distinction between the zoning designation of DGYC and Chaparral (the only other course identified by Plaintiffs) is that, while DGYC was zoned Conventional Residential, Chaparral was zoned Rural Residential. *See id.* at 30:19–23. Given that the Ordinance authorized Specific Use Permits for golf courses on property in either category, *see* Ordinance, Article V § 18–58, Defendant's Exh. 3, at 50–51, this is a distinction without a difference. Plaintiffs argue that DGYC should have been zoned General Commercial, but they cannot identify any other golf course that the City zoned General Commercial. The City's decision to include golf courses in residential zones may be debatable as a matter of policy, but the facts support no other conclusion than that the City applied its policy in a substantially equal manner to all golf courses regardless of whether their owners had taken public positions against the City.

Because the City has shown that it would have taken the same action regardless of Hill's protected activity, its Motion for Summary Judgment on Plaintiffs' First Amendment Claim is hereby **GRANTED**.

### IV. Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment is hereby respectfully **DENIED** with regard to Plaintiffs' Fifth Amendment takings claim. Defendant's Motion is hereby **GRANTED** with regard to Plaintiffs' First Amendment retaliation claim, and this claim is hereby **DISMISSED WITH PREJUDICE**. Each Party is to bear its own taxable costs, attorneys' fees, and expenses incurred herein to date. Barring amicable resolution by the Parties, this case will proceed to trial as scheduled.

**IT IS SO ORDERED.**