# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40040

United States Court of Appeals
Fifth Circuit

**FILED**

May 21, 2015

Lyle W. Cayce
Clerk

BARBARA JEANNETTE SINGLETON,

> Plaintiff - Appellant

v.

MICHAEL DARBY,

> Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:12-CV-935

Before DAVIS, DENNIS, and COSTA, Circuit Judges.

PER CURIAM:*

Plaintiff-Appellant Barbara Jeannette Singleton ("Singleton") filed this action under 42 U.S.C. § 1983 against Defendant-Appellee Michael Darby ("Darby"). Singleton claims that Darby retaliated against her for exercising her First Amendment rights. She also claims that Darby subjected her to excessive force in violation of the Fourth Amendment. Singleton appeals the district

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-40040

court's order granting summary judgment in Darby's favor on both of her claims. We affirm.

I.

On November 19, 2012, citizens opposed to the Keystone XL Pipeline conducted a protest at Farm to Market Road 1911 in Cherokee County, Texas. Approximately eighty people attended the protest, including Singleton, a retired schoolteacher who opposes the pipeline. Although a few of the protestors, including Singleton, were older persons, and a few of the protestors were confined to wheelchairs, a video taken at the protest demonstrates that a large number of the protestors were young and able-bodied.

The Cherokee County Sheriff's Department dispatched a truck carrying a cherry picker to the site of the protest to remove protestors from nearby trees. The Sheriff's Department also dispatched Darby, a deputy sheriff sergeant, to ensure that the protest remained under control.

The truck arrived at the scene first, with Darby following behind in his police car. Some of the protestors, including Singleton, became concerned that the truck was about to run over a young demonstrator. Accordingly, they entered the road and began screaming at the driver to stop. One protestor banged on the hood of the truck, jumped on the vehicle, and opened the door to make the driver stop. Upon witnessing the protestor climb on the truck, Darby exited his vehicle and began walking toward the protestor. Before the protestor reached the driver of the truck, he jumped off the truck and fled.

At some point, the young demonstrator in the path of the oncoming truck stood up and moved out of the way. Several protestors nevertheless remained in or entered the road to prevent the cherry picker from reaching the protestors in the trees. The video shows several protestors leaning against the grill of the

truck and inviting about a dozen other protestors into the road to block the truck's path. Singleton remained in the road during this time.

Darby walked toward the protestors blocking the truck, including Singleton, and ordered them to "[g]et out of the road." The protestors did not obey his command. Approximately five seconds later, Darby leveled a stream of pepper spray toward Singleton and several other protestors in the road. Darby did not spray any of the protestors on the sides of the road who were not obstructing traffic.

Singleton described the burning in her eyes as extremely painful. After Singleton left the protest, she visited her doctor, who treated and released her that same day.

Singleton alleged that Darby violated her constitutional rights under the First and Fourth Amendments by using pepper spray on her. The district court concluded that Darby was entitled to qualified immunity from Singleton's suit, and accordingly granted summary judgment in Darby's favor.

II.

We review a district court's grant of summary judgment *de novo*.[1] Summary judgment is proper if the record demonstrates no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[2]

> Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene. A court of appeals need not rely on the plaintiff's

---

[1] *Kitchen v. Dallas Cnty., Tex.*, 759 F.3d 468, 476 (5th Cir. 2014) (citing *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999)).

[2] *Id.* (citing *Deville*, 567 F.3d at 163-64; *Burge*, 187 F.3d at 464-65).

No. 14-40040

description of the facts where the record discredits that description but should instead consider "the facts in the light depicted by the videotape."[3]

## III.

To survive summary judgment on her First Amendment retaliation claim, Singleton must, among other things, produce sufficient evidence that (1) she was "engaged in constitutionally protected activity;" (2) Darby's actions caused her "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;" and (3) Darby's adverse actions "were substantially motivated against [her] exercise of constitutionally protected conduct."[4]

We conclude that Singleton failed to demonstrate a genuine dispute of material fact as to the first of these elements. The First Amendment does not entitle a citizen to obstruct traffic or create hazards for others.[5] A State may therefore enforce its traffic obstruction laws without violating the First Amendment, even when the suspect is blocking traffic as an act of political protest.[6] The video demonstrates that Singleton and her compatriots were obstructing traffic in violation of Texas law.[7] Thus, Singleton was not engaging in constitutionally protected activity at the time Darby pepper sprayed her.

---

[3] *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

[4] *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (citations omitted).

[5] *Cox v. Louisiana*, 379 U.S. 536, 553-58 (1965); *Frye v. Police Dep't of Kan. City, Mo.*, 260 F. Supp. 2d 796, 799 (W.D. Mo. 2003).

[6] *Cox*, 379 U.S. at 553-58.

[7] TEX. PENAL CODE ANN. § 42.03(c) (West 2014).

No. 14-40040

The dissent contends that Singleton's earlier protest on the side of the road constitutes the necessary protected activity. But Singleton never made this argument, and for good reason: Singleton was in the street by the time Darby arrived. Darby therefore never witnessed Singleton's protected activity, so there would be no basis for finding he retaliated against that earlier roadside activity if Singleton had raised this claim.

Singleton has likewise failed to create a fact issue on the motivation element. The record fails to show that Darby pepper sprayed the protestors for any reason other than to clear the road and to allow the cherry picker to get through the blockade. Darby did not disturb any of the protestors lawfully exercising their speech and assembly rights along the sides of the road.[8] Moreover, Darby ordered Singleton and her fellow protestors to "get out of the road," rather than to cease the protest entirely. This affirmatively demonstrates that Darby pepper sprayed Singleton and her group not because they were protesting, but because they were blocking traffic in violation of Texas law.

For these reasons, the district court properly granted summary judgment in Darby's favor on Singleton's First Amendment retaliation claim.

IV.

We now consider Singleton's excessive force claim. To survive summary judgment, Singleton must, *inter alia*, demonstrate that Darby's use of force was objectively unreasonable under the circumstances and under current

---

[8] *Compare McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1138 (W.D. Wash. 2011) (holding that a jury could infer that defendant officers "desire[d] to silence the protestors' speech" where officers "launch[ed] tear gas into an entire crowd" of protestors rather than solely at the "aggressive" protestors demonstrating "near the line of police officers").

law.[9] "Once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the objective reasonableness of Darby's actions "is a pure question of law."[10] The qualified immunity doctrine, "even on summary judgment, 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'"[11]

"'To gauge the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force,' paying 'careful attention to the facts and circumstances of each particular case.'"[12] Even at the summary judgment stage, "[w]e must evaluate an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[13] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."[14]

For the following reasons, Darby's use of force was not objectively unreasonable. First, although Singleton's crime was not particularly severe,

---

[9] *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)).

[10] *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis and internal quotations omitted).

[11] *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)).

[12] *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Flores*, 381 F.3d at 399).

[13] *Poole*, 691 F.3d at 628 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[14] *Graham*, 490 U.S. at 396-97.

No. 14-40040

she was blocking traffic in violation of Texas law,[15] and the State of Texas has an interest in keeping its roads free of obstructions.[16]

Secondly, a reasonable officer would have concluded that the protestors posed a threat to Darby, the driver of the truck, the truck itself, or to others. The protestors vastly outnumbered Darby. Darby saw one of the demonstrators climb onto the truck, bang on its hood, and open the truck's door. The video shows several young protestors leaning against the grill of the truck and inviting other protestors to block the vehicle. Because numerous other protestors remained crowded around the truck, a reasonable officer could have believed that other protestors might climb on the truck or attack the driver. A reasonable officer in Darby's position could have reasonably concluded that the protestors were out of control and that the situation required definitive action to move the truck past the demonstrators and out of danger.

Third, Singleton and her compatriots resisted Darby's attempt to clear the road. Singleton admits that she heard Darby's warning before he pepper sprayed her group. The video demonstrates that Darby gave Singleton sufficient time to at least begin walking out of the road before he deployed the pepper spray. Singleton nevertheless did not move. Although Singleton testified in her deposition that Darby did not give her enough time to react, we must credit the video evidence over Singleton's contrary testimony.[17]

Thus, Darby, as a reasonable officer, was justified in using some degree of force to clear the road. The force Darby employed was not disproportionate to the need. Deploying pepper spray was not an unreasonable way to defuse

---

[15] TEX. PENAL CODE ANN. § 42.03(c) (West 2014).

[16] *See Cox*, 379 U.S. at 554-55.

[17] *See Carnaby*, 636 F.3d at 187 (quoting *Scott*, 550 U.S. at 381).

the situation. Indeed, it was probably the least intrusive means available to Darby. To reiterate, the protestors vastly outnumbered Darby. As one of only two police officers on the scene,[18] Darby could not have individually handcuffed and arrested each of the numerous protestors blocking the road. In addition to the obvious difficulty of one officer attempting to handcuff so many violators, Darby faced the likelihood that such an action could motivate a larger number of protestors lining the road to join in the road-blocking enterprise or otherwise retaliate against Darby. Darby's decision to utilize pepper spray was therefore not an unreasonable way to gain control of a potentially explosive situation.

Moreover, even assuming *arguendo* that Darby's use of force did violate Singleton's constitutional rights, Singleton would still need to also demonstrate that those rights were "clearly established" at the time of her injury.[19] The dissent contends that Singleton has satisfied this prong of the qualified immunity analysis because

> at the time of the pepper-spraying incident, Singleton had a clearly established right to be free from excessive force and it was clearly established that the amount of force that Darby could use depended on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee.[20]

---

[18] The video depicts a second man in a white shirt and tie with a badge and a handgun in a holster accompanying Darby, but the record does not identify this man or his position with law enforcement. Even though Darby was not alone, the protestors still greatly outnumbered law enforcement officers at the scene.

[19] *See Hernandez v. United States*, --- F.3d ----, 2015 WL 1881566, at *1 (5th Cir. 2015) (en banc) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

[20] (Internal citations, brackets, and ellipses omitted.).

No. 14-40040

However, the Supreme Court recently repeated its warning against defining the law in question "at a high level of generality."[21] In doing so, the Supreme Court rejected the lower court's reliance on a generalized assessment of the *Graham* factors for overcoming qualified immunity in an excessive force case – the same analysis the dissent employs to try and defeat qualified immunity here.[22] Instead, to overcome qualified immunity, the plaintiff must identify case law clearly establishing that the "official acted reasonably in the particular circumstances that he or she faced."[23] Notably, the dissent is unable to point to case law with facts anywhere close to the particular circumstances involved here – the use of pepper spray to clear a road filled with protestors who vastly outnumbered law enforcement – that would have placed Darby on notice that his conduct was unlawful.

Thus, viewing the facts through the deferential lens of qualified immunity and from the perspective of a reasonable officer on the scene, we conclude that Darby's use of force was not objectively unreasonable under the circumstances. At a minimum, case law did not make it clear to every reasonable officer that use of pepper spray in this situation was unreasonable.[24] The district court therefore properly granted summary judgment in Darby's favor.

AFFIRMED.

---

[21] *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011)).

[22] *See id.*

[23] *Id.*

[24] *See Ashcroft*, 131 S. Ct. at 2083.

No. 14-40040

JAMES L. DENNIS, Circuit Judge, concurring in part and dissenting in part.

Respectfully, I concur in the judgment only insofar as it rejects Singleton's First Amendment retaliation claim, and I dissent from the majority's affirmance of summary judgment against Singleton on her Fourth Amendment excessive force claim.

Regarding the Fourth Amendment claim, the majority incorrectly read the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007) to hold that in analyzing a motion for summary judgment in an excessive force case in which the record contains a videotape of crucial events in question, a court is not required to determine the relevant facts by adopting the plaintiff's version of events and reading the record in the light most favorable to the plaintiff, but rather should decide whether the officer violated the Fourth Amendment solely in light of the facts depicted by the videotape. *Scott v. Harris* did not so hold. Rather, the Court so proceeded in that case *only* because the record contained a telling videotape that "blatantly" and "utterly" contradicted and discredited the plaintiff's version of the facts, so that no reasonable jury could have believed him. *Id.* at 378-80. In a case, such as the present one, in which the record with a videotape does not contradict, but instead corroborates, plaintiff Singleton's version of the facts, the court is required to apply standard summary-judgment principles, including accepting the plaintiff's version of the facts as the basis for its decision and viewing the record and reasonable inferences in the light most favorable to her. The majority's failure to do so skewed its entire decisional process, leading it to erroneously affirm the district court's summary judgment.

10

No. 14-40040

On the other hand, Singleton's First Amendment claim falters, but only because she failed to present sufficient evidence to show that Sergeant Darby's conduct was substantially motivated by her constitutionally protected speech activities against the XL pipeline. The majority's additional reasons for affirming summary judgment on this claim erroneously disregard the fact that Singleton undisputedly had engaged in constitutionally protected speech against the pipeline on the side of the road just before she was pepper sprayed by Sergeant Darby. Thus, the majority reaches the right result on this claim, although its reasoning is partly flawed.

## I.

In *Scott v. Harris*, 550 U.S. 372 (2007), Deputy Scott terminated a high-speed chase of Harris, a motorist clocked speeding, by bumping his car and causing it to crash, rendering Harris a quadriplegic. *Id*. at 374-75. Harris's § 1983 action alleging Scott's use of excessive force in violation of the Fourth Amendment survived Scott's motion for summary judgment on the basis of qualified immunity below, but the Supreme Court granted *certiorari* and reversed.

In *Scott*, the Court stated that the threshold inquiry is whether Deputy Scott's actions violated the Fourth Amendment and that usually the first step in assessing the constitutionality of Scott's actions is to determine the "relevant facts." *Id*. at 378. Upon motion for summary judgment, if there is a genuine issue as to a material fact, courts are required to view the facts and draw all reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Id*. "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Id*.

But in *Scott*, the Court stated that there was an "added wrinkle" that prevented a straightforward application of these regular summary-judgment

11

principles. *Id.* That "wrinkle" was the existence of a police videotape of the auto chase, which together with the whole record, so "blatantly" contradicted Harris's version of the facts that no reasonable jury could believe it. *Id.* at 378-80. According to the Court, in such a case, a court should not adopt the plaintiff's version of the facts for purposes of ruling on a motion for summary judgment. *Id.* at 389.

The present case is clearly distinguishable from *Scott v. Harris*, however, because Singleton's version of the events, unlike that of Harris, is not "blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *Id.* at 380. To the contrary, Singleton's evidence of Darby's use of excessive force on her is not contradicted, but is largely corroborated by the one-minute videotape and Darby's own deposition testimony. Thus, the present case meaningfully differs from *Scott*, because there is no "added wrinkle," *id.*at 378, of a videotape and record that "blatantly contradict" *id.* at 380, and "utterly discredit," *id.*, Singleton's story. Rather, unlike the unusual situation in *Scott*, the present case is a more typical summary-judgment case in which this court is required to begin its analysis by adopting the plaintiff's version of the facts and to view them and all reasonable inferences in the light most favorable to her.

A proper application of the well-established summary judgment principles to the record in the present case leads to the following conclusions: based on the relevant set of facts, *see* Part II *infra*, Sergeant Darby violated clearly established Fourth Amendment law by pepper spraying Singleton in her face and eyes without providing her any warning or opportunity to comply with his command, *see* Part III *infra*, but Singleton has failed to produce sufficient evidence to establish that Darby's conduct amounted to retaliation in violation of the First Amendment, *see* Part IV *infra*.

No. 14-40040

## II.

On November 19, 2012, a group of protesters peacefully gathered along the side of Farm-to-Market Road 1911 in Cherokee County, Texas, in order to protest the construction of the Keystone XL pipeline on a site nearby. Among those in attendance was Singleton, a 75-year-old grandmother, retired school teacher, and long-time resident of Nacogdoches County, Texas. Singleton attended the protest with a group calling itself the Raging Grannies in Nacogdoches. The Raging Grannies intended to protest the pipeline by singing songs decrying its adverse environmental effects while dressed in old-fashioned clothes. Singleton, for example, wore "an old-fashioned lacy blouse and a big blue skirt."

Sergeant Darby explained in his declaration that he and other members of the Cherokee County Sherriff's Office were dispatched to various locations throughout Cherokee County due to protests occurring against the pipeline. Because some protesters reportedly were located in trees,[1] the Sheriff's Department also ordered and dispatched a semi-trailer truck hauling a "cherry picker" to be delivered to a protest site in order to remove those protesters from the trees. The truck transporting the cherry picker was driven by Danny Emerson, an employee of United Rentals. Sergeant Darby followed behind Emerson's truck in his patrol car.

As Emerson's truck slowly approached the area where Singleton and others were standing, the group became concerned that the truck might run over a young person who was in attendance. Some of the protesters, including

---

[1] The record is unclear whether those individuals reportedly located in trees were a part of the same group of protesters as Singleton, or whether they were affiliated with another pipeline protest nearby.

13

No. 14-40040

Singleton, therefore entered and spread across the roadway in order to flag down the truck. The protesters shouted multiple warnings to Emerson that, "[His] truck's running over somebody."[2]  In addition, some people also sought to stop Emerson's truck by banging by hand on its hood.  However, Emerson testified that none of the protesters ever touched him or damaged his truck, and he explained that Singleton was not among the protesters touching his truck.  In response to the protesters' warnings, Emerson stopped his truck in the road.  One protester climbed onto the side of Emerson's truck and tried to open its door.  Darby, who had stopped behind the truck, exited his patrol car and walked toward the front of the truck along its left side.  Before Darby reached the cab of the truck, that protester jumped off the truck and ran away.

Darby did not pursue that protester but instead continued to walk toward the other protesters who were still gathered in the roadway near the front of the truck.  A one-minute video taken of the scene, which begins shortly before Darby came abreast of the truck's cab, shows the following:[3]  After Emerson stopped his truck, a young protester crawled from near the front end of the stationary truck.[4]  Two protesters leaned against the truck's front grill.

---

[2] Emerson himself testified that the protesters yelled warnings to him that his truck was running over someone.

[3] The video camera was located off the highway on the right side of and slightly in front of the stopped truck.  Singleton submitted the video as an exhibit to her brief opposing summary judgment, and Darby does not contest its accuracy.  However, as explained above, this is not a case where we may disregard the non-movant's version of events in light of a video's contrary portrayal, *compare Scott*, 550 U.S. at 380-81, because the video footage contained in the record does not blatantly contradict or discredit Singleton's version of the facts but instead substantially corroborates her and the other protesters' testimony.

[4] This crawling protester appears within the first few seconds of the video.  It is not evident from the video whether this young protester who can be seen crawling from near the front end of the truck was the same young protester whom the protesters thought the truck might hit.

No. 14-40040

Some of the protesters, including Singleton, stood in the road, and other protesters eventually began to join them, including a woman confined to a wheelchair.[5]  Many of the protesters held signs; some laughed, talked and called for others to join them.   However, contrary to Darby's attorney's argument, the video does not show any protester screaming or making threats to Emerson or anyone else.   Moreover, the video does not show that any protester raised his or her voice or complained to Darby until after he began to pepper spray the gathering.

Approximately twenty-three seconds into the video, Darby can be seen walking toward the protesters on the left side of the truck and near its front end.   At this time, he twice shouted in short succession, "Get out of the road." Approximately five seconds later, without warning the protesters that he would use pepper spray, Darby began deploying pepper spray at the protesters, including Singleton, in the roadway.  Darby was about 10-to-15 feet from them at this time.  In his deposition, Darby admitted that he discharged the pepper spray in a "steady stream."  Prior to unleashing the pepper spray, Darby did not attempt to use any less drastic measure to move the protesters out of the roadway.  For example, he admitted in his deposition that did not warn the protesters that he would arrest them or use pepper spray or other force against them if they stayed in the road—he testified, "[t]here was no reason to tell them."  Thus, he did not warn them that he would give them only five seconds to clear the road before he would use pepper spray on them.  Nor did he call for backup by other officers to help him to move the protesters off the road or to

---

[5] The video shows that at least two of the protesters in attendance were confined to wheelchairs.

make arrests.[6]  The video footage shows that Darby aimed and then unleashed the pepper spray, sweeping it at approximately face-level in the direction of the protesters.  After most of the protesters fled to avoid the pepper spray, Darby can be seen walking around among the stragglers and aiming the pepper spray directly at certain individuals.  Approximately thirty-eight seconds into the video, Singleton can be seen exiting the road and rubbing her eyes; subsequently, the video shows her bent over and covering her eyes.  Although the video does not capture the exact moment when Darby's pepper spray hit Singleton in her face and both eyes, the protesters can be heard repeatedly yelling to Darby that he pepper sprayed an "old" or "elderly lady."  Thus, it was not until after Darby unleashed the pepper spray without warning that anyone challenged his actions, and then it was only verbally and non-violently.

The video footage corroborates the account of the pepper spraying given by Singleton and other protester-witnesses.  For example, according to Singleton, Darby "pepper sprayed [her] immediately before [she] had time" to comply with his command.  Significantly, Singleton testified that "[she] would have got out of the road if he had given us some time."[7]  Another witness

---

[6] Notably, however, another peace officer in a white shirt and tie, with a badge and a handgun in a holster, can be seen in the video slowly and passively walking along and observing Darby pepper spray the protesters.  Although he might have been another deputy sheriff, the record does not otherwise identify him.

[7] Singleton further elaborated as follows at her deposition:

> Q: "And you heard him say, 'Get out of the road?'"
> A: "'Get out of the road,' but he didn't give me time to get out of the road."
> Q: "Well, did you make any effort at all to get out of the road?"
> A: "I don't think I did because I didn't have time."
> Q: "Well, did you make any movement like you were going to get out of the road?"
> A: "I don't know.  He didn't say, 'Get out'- - he did not give us a - - give me a warning."

16

similarly testified that Darby "all of a sudden" began pepper spraying the protesters without any warning aside from ordering them to exit the road. Further, consistent with Singleton's deposition testimony that Darby "was very close to [her]," the video shows Darby to be in close proximity of the protesters when he deployed the pepper spray.

Numerous witnesses described the aftermath of the pepper spraying. One witness stated that Singleton was "incapacitated" after being hit, and another stated that Singleton was "in intense excruciating pain." According to one witness, "I really thought [Singleton] was dying, her skin was yellow, her hands were clenched and she had yellow stains all over this lacy white blouse." Photos from the scene show Singleton after being pepper sprayed. In one photo, Singleton is shown having her eyes washed with liquid. Singleton stated that the pepper spraying was "the most painful thing" she's ever experienced, including childbirth. After being driven home by a friend because she was unable to drive, Singleton sought medical attention for her injuries because flushing her eyes with water did not alleviate her pain.

## III.

Singleton appeals the district court's grant of summary judgment to Darby on her Fourth Amendment excessive-force claim. Summary judgment

---

. . .
Q: "So your testimony is, is that after he said, 'Get out of the road,' that if he had waited another 5 seconds, you would have walked out of the road?"
A: "Yes. I mean, I've never done anything illegal in my life."
Q: "Well, if all these other people stayed there in the road, and you've admitted you were caught up in the moment, your testimony is you still would have just walked on out of the road?"
A: "If he had given us some warning and told us what he was fixing to do, yeah."
Q: "Well, how much warning would you have needed?"
A: "A minute, at least a little bit of time to process. . . ."

17

on the basis of qualified immunity is appropriate only if, taking the facts in the light most favorable to Singleton, she has not established that Darby's "conduct violated a constitutional right," *Saucier v. Katz*, 533 U.S. 194, 201, (2001), or if "the right at issue was [not] clearly established at the time of [Darby's] alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted).

Claims for excessive force are analyzed under the Fourth Amendment's prohibition against unreasonable seizures using the framework articulated in *Graham v. Connor*, 490 U.S. 386 (1989). The reasonableness of a seizure turns on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. In order to determine whether an officer's actions were "objectively reasonable" and therefore constitutionally permissible, we must first assess "the nature and quality of the intrusion on the individual's Fourth Amendment interests" and then balance that particular intrusion "against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

If we determine that, taking the facts in the light most favorable to Singleton, Darby's conduct amounts to a violation of the Fourth Amendment's prohibition on excessive force, we then determine whether Darby is entitled to qualified immunity by assessing whether "the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal quotation marks omitted).

No. 14-40040

## A. Nature and Quality of Intrusion

The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to the type and amount of force inflicted. *See Tennessee v. Garner*, 471 U.S. 1, 7-9 (1985). Singleton contends that Darby pepper sprayed her after ordering her and the other protesters out of the road but without giving her a reasonable chance to do so. "Unquestionably, infliction of pepper spray . . . has a variety of incapacitating and painful effects . . . and, as such, its use constitutes a significant degree of force." *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010). Indeed, "[p]epper spray is *designed* to cause intense pain and inflicts a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx, as well as disorientation, anxiety, and panic." *Young v. Cnty. Of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011) (internal quotation marks omitted); *see also Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (observing that pepper spray is designed to disable the person sprayed "by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx" (internal quotation marks omitted)), *overruled on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010); *accord United States v. Neill*, 166 F.3d 943, 949-50 (9th Cir. 1999) (affirming district court finding that pepper spray is a "dangerous weapon" under the U.S. Sentencing Guidelines and describing trial evidence that pepper spray causes "extreme pain" and is "capable of causing 'protracted impairment of a function of a bodily organ'" as well as lifelong health problems such as asthma).

In the instant case, Darby admits that he unleashed a "steady stream" of pepper spray that hit Singleton in the face and both her eyes. Singleton

No. 14-40040

testified that the ensuing pain was the most excruciating that she has ever experienced, including childbirth, and she was so incapacitated from the pain that she could not even drive home.  Singleton was forced to seek medical attention for her injuries.

As the foregoing makes clear, by pepper spraying Singleton, Darby used a significant amount of force that is known to cause and, in fact, *did* cause substantial pain.  While pepper spray may be less severe than other forms of force, there is no question that streaming it into the face and eyes of a 75-year-old woman is a sufficiently serious intrusion that it must be justified by a proportionally serious governmental interest.

### B. Governmental Interest at Stake

In assessing the governmental interest at stake, we are guided by the "*Graham* factors," which "include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she was] actively resisting arrest or attempting to evade arrest by flight.'" *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 626 (5th Cir. 2006) (quoting *Graham*, 490 U.S. at 396).  However, "[b]ecause the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Graham*, 490 U.S. at 396 (internal quotation marks omitted), our ultimate inquiry must focus on "whether the totality of the circumstances justified [the] particular . . . seizure" at issue. *Garner*, 471 U.S. at 8-9.

First, the severity of Singleton's alleged crime was indisputably minimal, if it was an offense at all.  In Texas, it is a Class B misdemeanor[8] to

---

[8] In Texas, a Class B misdemeanor is punishable by "(1) a fine not to exceed $2,000; (2) confinement in jail for a term not to exceed 180 days; or (3) both such fine and confinement."  Texas Penal Code § 12.22.

20

No. 14-40040

intentionally, knowingly, or recklessly, obstruct a highway; or to disobey a reasonable request or order to move issued by a peace officer. Texas Penal Code § 42.03. Singleton testified that she entered the road with other protesters to warn the truck driver not to hit a young protester who had wound up in the road. She further testified that she would have obeyed Darby's order to move if he had given her a chance to do so, but that he pepper sprayed her in her face and eyes immediately after his order, making it impossible for her to move before being incapacitated by the pepper spray. Even assuming Singleton was violating the law, the offense was at most a nonviolent misdemeanor, and her infraction was therefore minimal. Because Singleton's alleged offense did not evince that she posed a danger to Darby or the public such that there would be a heightened interest in the use of pepper spray on her or the other protesters, the "severity of the crime at issue" weighs against a finding that the government had an interest in the use of pepper spray in this particular case. Although the alleged commission of a minor or misdemeanor offense is not to be taken lightly, we repeatedly have recognized that it militates against concluding that the use of significant force was objectively reasonable. *See, e.g., Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("[The plaintiff] was stopped for a minor traffic violation. . . making the need for force substantially lower than if she had been suspected of a serious crime.").

Application of the second *Graham* factor—the individual's threat to officer safety—likewise buttresses the conclusion that Darby's use of pepper spray against Singleton was excessive and objectively unreasonable. Viewed in the light most favorable to Singleton, the evidence establishes that the pipeline protesters, including Singleton, had been entirely peaceful in their protest and had lawfully confined their speech activities to the side of the road

21

until they moved into the road in order to flag down Emerson's truck before it ran over a young protester in the road. Although one protester reportedly responded by climbing onto the side of Emerson's truck, Darby admitted that this protester jumped off the truck and ran away after he exited his patrol car and before he deployed the pepper spray. Moreover, the evidence shows that Singleton herself never made any contact with Emerson's truck, and that none of the protesters damaged the truck or ever touched Emerson. The video footage of the scene further reinforces the conclusion that neither Singleton nor the other protesters posed a threat to Darby. The video-audio footage reflects that the protesters did not threaten or scream at Darby or Emerson; to the contrary, some of the protesters can be seen laughing and talking with one another peaceably before Darby pepper sprayed them. In fact, the video does not show any of the protesters raising their voices at Darby until he hit Singleton with pepper spray, at which time the protesters can be heard repeatedly yelling to Darby that he had pepper sprayed an "old" and "elderly lady." Moreover, although the protesters were allegedly committing a minor offense, the video shows that none of the protesters ever made an advance toward Darby. Further, nowhere in his sworn declaration or at his deposition did Darby himself ever contend that the use of pepper spray was necessary because of a threat of violence by the protesters; rather, he asserted that his "only purpose" in unleashing the pepper spray was to "clear the roadway." Finally, but critically, it is important to note that Singleton was 75 years old at the time of the protest, and that the group of protesters who Darby pepper sprayed also included individuals who were confined to wheelchairs. *See, e.g., Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005) ("In judging the

22

objective reasonableness of [the] use of force, it should not be forgotten that [plaintiff] was fifty-nine years old and five feet two inches tall.").[9]

The third *Graham* factor—whether Singleton or anyone resisted Darby—further supports a conclusion that Darby's use of pepper spray against her and the others was objectively unreasonable. Crediting all reasonable inferences in her favor, Singleton presented evidence that she and the other protesters did not have a reasonable opportunity to comply with Darby's command to vacate the road before he pepper sprayed them, and, therefore, they did not actively resist him before he used pepper spray on them. Indeed, the video footage clearly demonstrates that Darby unleashed the pepper spray only about five seconds after shouting to the protesters to leave the road; thus, Singleton and the other protesters never had a reasonable opportunity to comply with his order.[10] Moreover, Singleton testified at her deposition—

---

[9] While it may not be dispositive of whether Singleton posed a reasonable threat to Darby or not, it is important to note that the video footage suggests that Darby had additional manpower with him at the scene. Specifically, the video shows that a man who accompanied Darby as he approached the protesters was neatly dressed in a dress shirt and tie with a badge, handcuffs and a holstered handgun at his waist. Although the record does not identify the man, drawing all reasonable inferences from the video in Singleton's favor, Darby appears to have been accompanied by an armed law enforcement officer when he confronted the protesters, which further evinces that the protesters posed no threat that warranted the nearly immediate use of pepper spray.

[10] In this connection, the majority clearly fails to view the controverted facts in the light most favorable to Singleton by concluding: "The video demonstrates that Darby gave Singleton sufficient time to at least begin walking out of the road before he deployed the pepper spray. Singleton nevertheless did not move." However, this material issue of fact, whether Darby gave Singleton and the other protesters reasonably sufficient time to vacate the roadway before he pepper sprayed them, is genuinely in dispute and must therefore be resolved in Singleton's favor for purposes of summary-judgment analysis. *First*, Darby admitted that he gave no warning whatsoever to Singleton and the other protesters that he would pepper spray them if they remained in the road. *Second*, Singleton and her witness, Mr. Macinerney, (who said he was only 10 feet from her when she was pepper sprayed), both testified that Darby yelled "get out of the road" and then walked up to Singleton and, without any further warning, pepper sprayed her in the face; that no one was threatening or resisting

which we must credit in her favor at this stage of proceedings—that she would have exited the road if Darby had given her time to obey his command.[11] When, as here, a police officer does not give sufficient time to comply with an order prior to utilizing force against a person, that person's resulting failure to comply immediately with the order cannot, without more, give rise to a governmental interest in the use of significant force. Thus, viewed in the light most favorable to Singleton, the evidence therefore simply does not support a conclusion that it was reasonably necessary for a police officer in Darby's position to use pepper spray or other significant force based on any resistance to Darby's command by Singleton or any other protester.

In addition to the foregoing *Graham* factors, other critical aspects of this case warrant highlighting, as they further evince the slightness of the governmental interest vis-à-vis the significance of the force Darby used against Singleton. First, the evidence establishes that Darby never attempted to utilize any less severe tactic to remove the protesters from the road prior to unleashing pepper spray on Singleton. For example, prior to using pepper spray, Darby could have called for backup; he could have requested that the additional peace officer on the scene help him order the protesters off the

---

Darby; and that Singleton would have moved out of the road if Darby had given her a minute or at least a few more seconds to do so. *Third*, the videotape corroborates Singleton's and Macinerney's testimony: it shows that Darby yelled "get out of the road" twice and then, 4 to 5 seconds later, began to pepper spray the protesters in the road at face level; that Singleton was not visible in the video at that exact time but about thirty-eight seconds into the video can be seen exiting the road after having been pepper sprayed and thereafter bending over on the side of the road. Thus, contrary to the majority's conclusion otherwise, the summary-judgment record amply supports a reasonable inference that Darby did not give Singleton "sufficient time" to move.

[11] Specifically, Singleton repeatedly emphasized: "[Darby] didn't give me time to get out of the road" and "I would have got out of the road if he had given us some time." Asked by Darby's counsel how much of a warning she would have needed, Singleton testified: "A minute, at least a little bit of time to process."

highway or make arrests; he could have warned the protesters that they would be arrested if they did not immediately comply with his command; or he simply could have attempted to arrest the protesters.  But Darby chose none of these options, thus skirting a number of less painful and potentially injurious measures that would have been feasible and reasonable under the circumstances.  Instead, he chose to immediately resort to a significant form of force that caused Singleton excruciating pain.  Darby's failure to first utilize such viable alternatives thus further illustrates how limited was the government's interest in deploying the use of substantial force against Singleton.  *See, e.g., Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (emphasizing that "there were clear, reasonable, and less intrusive alternatives" than the use of taser, such as waiting for backup); *Headwaters Forest Defense v. Cnty. of Humboldt*, 240 F.3d 1185, 1203 (9th Cir. 2000) ("Because the protesters posed no immediate threat to the safety of anyone during the protests, the officers . . . were required to consider what other tactics if any were available to effect their arrest [aside from pepper spray]." (internal marks and citation omitted)), *vacated on other grounds by* 534 U.S. 801 (2001), *affirmed on remand in* 276 F.3d 1125 (2002).  Moreover, Darby also never provided Singleton and the protesters a reasonable opportunity to comply with his command, nor did he provide any type of warning that pepper spray would be utilized if they did not immediately comply with his order to exit the road. *See Nelson v. City of Davis*, 685 F.3d 867, 882-83 (9th Cir. 2012) ("Additionally, there is nothing in the record that indicates that the group was told prior to the [use of the pepperball gun] how they should comply with the [officers'] orders . . . or that force would be used against them if they did not behave in a particular manner.  Thus, failure to give sufficient warnings also weighs

against the government's decision to use [a pepperball gun] against [plaintiff] and his associates.").

## C. Balancing Intrusion against Governmental Interest at Stake

Finally, to "[d]etermine whether the force used [by Darby] is 'reasonable' under the Fourth Amendment," we must "balanc[e] . . . the nature and quality of the intrusion on [Singleton]'s Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). The force used by Darby indisputably constituted a substantial intrusion upon Singleton's liberty. Indeed, pepper spray is known to cause significant pain and detrimental health consequences and, in fact, did cause Singleton the worst pain she said she has ever known— necessitating medical care. In evaluating the countervailing governmental interest that we must balance against this intrusion, as explained *supra*, all three *Graham* factors militate against a finding that the force used in this case was reasonable. First, Singleton was at most committing the minor crime of obstructing a highway, which is a Class B misdemeanor and non-violent in nature. Second, viewing the evidence in the light most favorable to Singleton, "there was no reason to believe that her actions posed a threat to the officer[], herself, or [others]." *Deville*, 567 F.3d at 167. Third, there is no evidence that Singleton or any other protester actively resisted Darby, because the evidence shows that Darby did not give them a reasonable opportunity to comply with his command before he pepper sprayed them. Finally, Darby's failure to try any of the less severe alternatives available before resorting to pepper spraying Singleton and the other protesters, and his failure to warn them that pepper spray would be used, further shows that the governmental interest in using the significant force of pepper spray under the circumstances was extremely limited or nonexistent.

Because the force imposed on Singleton by pepper spray was significant and the governmental interest in the use of that particular force was minimal, viewing the evidence in the light most favorable to Singleton, Darby's use of pepper spray was excessive and in violation of the Fourth Amendment.

Nevertheless, in order to deny Darby qualified immunity, it must also be determined whether at the time of the incident it was "clearly established" that such conduct would violate Singleton's Fourth Amendment rights. *Id.* at 169. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). Critically, the "clearly established" standard "does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope*, 536 U.S. at 739). Rather, the "central concept" of the standard "is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* (quoting *Hope*, 536 U.S. at 740).

At the time of the pepper-spraying incident, "[Singleton] had a clearly established right to be free from excessive force . . . and it was clearly established that the amount of force that [Darby] could use depended on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Deville*, 567 F.3d at 169 (internal marks and citation omitted). Viewing the evidence in the light most favorable to Singleton, she and the other protesters posed no threat, were not resisting arrest, and were committing, at the very

most, a non-violent, minor offense when Darby almost immediately and, without any warning that he would do so, resorted to the significant force of pepper spray. "While the Fourth Amendment's reasonableness test is 'not capable of precise definition or mechanical application,' the test is clear enough that [Darby] should have known that he could not [use pepper spray against Singleton and the other protesters under the particular circumstances.]" *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (quoting *Graham*, 490 U.S. at 396). Accordingly, I would conclude that Darby is not entitled to qualified immunity on Singleton's Fourth Amendment claim.

In reaching the opposite conclusion, the majority erroneously contends that the Supreme Court's recent decision in *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), requires us to find a case with nearly identical facts to the particular circumstances here in order to conclude that Darby's conduct violated "clearly established" Fourth Amendment law. In so doing, the majority grossly misreads that decision and altogether ignores the long-established principle that the lodestar in qualified-immunity cases is whether officers had "fair warning" that their conduct would violate a constitutional right. *See, e.g., Hope*, 536 U.S. at 740; *Kinney*, 367 F.3d at 350.

In *Plumhoff*, the Court held that police officers who shot the driver of a fleeing vehicle in order to end a dangerous car chase were entitled to qualified immunity. 134 S. Ct. at 2016-17. In conducting the "clearly established law" prong of its qualified immunity analysis, the Court emphasized its precedents observing that *deadly force* cases "depend[] very much on the facts of each case," meaning that a pure application of the *Graham* and *Garner* factors may not be appropriate in such a case. 134 S. Ct. at 2023 (discussing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Accordingly, in light of the unique fact that the officers utilized deadly force in response to a high-speed car chase, the

Court held that *Graham* and *Garner* alone did not put the officers on notice that their conduct violated "clearly established" Fourth Amendment law. *Id.* at 2023-24.

Contrary to the majority's position, *Plumhoff* does not eviscerate the long-established principle that a police officer is not entitled to qualified immunity where, as here, he has "fair warning" based on existing precedents that his conduct would violate the constitutional rights of the plaintiff. *Hope*, 536 U.S. at 740. Rather, as even a cursory review of *Plumhoff* reveals, the Court's "clearly established law" analysis pivoted entirely upon the unique fact that the case involved "deadly force" in response to a dangerous "vehicular flight," 134 S. Ct. at 2023, which is clearly not the case confronting us here. Indeed, unlike the instant case where there was no threat to Darby or the public whatsoever, the officers in *Plumhoff* "shot at Rickard to put an end to what had already been a lengthy, high-speed pursuit that indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby." *Id.*

Moreover, in addition to ignoring these meaningful factual distinctions between *Plumhoff* and the instant case, the majority also errs in concluding that *Plumhoff* militates against applying a "generalized assessment of the *Graham* factors" in order to conclude that Darby violated "clearly established" Fourth Amendment law. Such logic further reflects the majority's careless reading of *Plumhoff*. *Plumhoff* explicitly and repeatedly endorsed the Court's earlier decision in *Brousseau*, wherein the Court made clear that, *even in* the fact-dependent context of deadly force cases, "*Graham* and *Garner* alone [can] offer a basis for decision" that officers violated "clearly established" Fourth Amendment law in "an obvious case." *Brousseau*, 543 U.S. at 199. As explained above, this is an obvious case: in response to the alleged commission

of a non-violent and indisputably minor offense, Darby unleased pepper spray into the face and eyes of an elderly woman without providing her any warning or opportunity to comply with his command and without attempting to first utilize any less severe alternative whatsoever.[12]  Given these egregious facts, a reasonable officer in Darby's position would have "fair warning" that his conduct violated the Fourth Amendment's prohibition on excessive force pursuant to both Supreme Court and this Circuit's precedents.  *See, e.g, Graham*, 490 U.S. at 396; *Bush*, 513 F.3d at 502.

## IV.

Singleton also alleges that Darby's use of pepper spray against her amounted to retaliation against her for engaging in protected speech activities opposing the pipeline in violation of the First Amendment.  "The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities."  *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).  "As this court explained in *Colson*, if government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly."  *Id*. (citing *Colson v. Grohman*, 174 F.3d 498, 509 (5th Cir. 1999)).  In

---

[12] The majority's repeated reliance upon *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074 (2011) is similarly misplaced.  Unlike here, *Al-Kidd* involved an entirely novel constitutional issue, *viz*., whether "pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional."  *Id*. at 2083.  Also unlike here, "not a single judicial opinion" had ever so held.  *Id*.  The Court's language in *Al-Kidd* therefore must be read in light of the unique question confronting the Court.  Here, by contrast, we are confronted with a run-of-the-mill question that we have, time and again, confronted: whether a police officer may utilize a significant amount of force in response to a minor offense and where the suspect poses no threat whatsoever and does not resist the officer. *See Deville*, 567 F.3d at 169.  He cannot.

order to satisfy her burden under the first prong of the qualified-immunity test, Singleton must show that Darby's conduct amounted to unconstitutional retaliation and, accordingly, she must produce sufficient evidence to establish that (1) she was "engaged in constitutionally protected activity"; (2) Darby's actions caused her "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) Darby's "adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Here, contrary to the majority opinion's analysis, it cannot seriously be disputed that Singleton engaged in constitutionally protected activity when she joined in the protest against the Keystone XL pipeline on the side of the road. The majority opinion erroneously and narrowly focuses only on Singleton's conduct of standing in the roadway at the time of the pepper spraying. The majority thus elides the critical fact that Singleton had been engaged in constitutionally protected speech immediately prior to that point when she was lawfully protesting on the side of the road. [13] Regardless of

---

[13] The majority erroneously contends that Singleton never claimed that her earlier roadside speech activities served the basis for her retaliation claim, as opposed to her actions in the road itself. But even a cursory review of her brief belies the majority's conclusion. For example, the heading of her brief's section devoted to the retaliation claim uses the plural "protests," indicating that she contends Darby retaliated against her series of speech activities speaking out against the construction of the pipeline, including her protest on the side of the road. In addition, in other sections of her brief, Singleton emphasizes her speech activities on the side of the road. *See, e.g.*, Singleton Brief p. 3 ("Ms. Singleton, along with a number of other protestors lined the sides of a rural road . . ."); *id.* at 5 ("Ms. Singleton was doing what she had a lawful right to do during the afternoon of Nov. 19, 2012. Specifically, Ms. Singleton was in Cherokee County near the Goodman Bridge in Wells, Texas to protest and speak out on a matter of public concern: stopping the Keystone Pipeline.").

The majority derives its mistaken conclusion based on the fact that Singleton apparently was in the road prior to the time Darby exited his car and approached the protesters. According to the majority, because Darby never "witnessed" Singleton's protest on the side of the road, there would be no reason for him to retaliate against those speech activities. But the majority wholly ignores that the record shows that Darby, as well as other

whether Singleton allegedly was violating state law when she moved from the side of the road into the road, our own precedents illustrate that a plaintiff may suffer unconstitutional retaliation motivated by speech activities that occurred long prior to the challenged retaliatory conduct. *See, e.g., Keenan*, 290 F.3d at 261; *Rolf v. City of San Antonio*, 77 F.3d 823, 827-28 (5th Cir. 1996). In other words, a valid retaliation claim does not require that the plaintiff be actively engaged in constitutionally protected speech *at the very moment* a government agent engages in retaliatory conduct.

Nevertheless, I ultimately agree that summary judgment was properly granted to Darby on Singleton's retaliation claim, because Singleton has failed to produce sufficient evidence to create a genuine dispute as to the third element of her claim—*i.e.*, that Darby's use of pepper spray was "substantially motivated against her exercise of constitutionally protected conduct." *Id.* Because Singleton has failed to produce sufficient evidence to establish that Darby's conduct included one of the essential elements of unconstitutional First Amendment retaliation, Darby is entitled to qualified immunity on the First Amendment claim. *See McClendon v. City of Columbia*, 305 F.3d 314, 326-27 (5th Cir. 2002).

## V.

For these reasons, I respectfully dissent from the majority's decision affirming the grant of summary judgment for Darby on Singleton's Fourth Amendment claim. However, I concur in the judgment affirming the district court's grant of summary judgment for Darby on Singleton's First Amendment

---

members of the Cherokee County Sheriff's Department, were dispatched throughout the area in response to the protests against the pipeline. This raises a reasonable inference that Darby would have been aware of the protests against the pipeline before encountering Singleton and the other protesters obstructing the road itself.

claim, but only because Singleton presented insufficient evidence that Darby's actions were substantially motivated by her speech against the construction of the pipeline.